Filed 11/16/23  P. v. Schuster CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097238 |
| Plaintiff and Respondent, | (Super. Ct. No. 60791) |
| v. | |
| RUDOLF SCHUSTER, | |
| Defendant and Appellant. | |

Petitioner Rudolf Schuster is a noncitizen legal resident.  In 1981, a jury found him guilty of five counts of lewd and lascivious acts against a child under 14 years old and two counts of oral copulation with a child under 14 years old and more than 10 years younger than petitioner.  Today, those convictions make petitioner vulnerable to removal proceedings by federal immigration officials.  To stave off potential removal, petitioner in 2022 filed a motion under Penal Code[1] section 1473.7 to vacate his convictions.  He

---

[1]  Further undesignated section references are to the Penal Code.

1

contends that, had his attorney in the sexual abuse case informed him of the immigration consequences of standing trial and being found guilty, he would have attempted to negotiate a plea agreement that did not carry negative immigration consequences. The trial court denied his motion. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner was born in Romania and previously lived in Austria. In 1956, when petitioner was 13 years old, he and his family immigrated to the United States, where they were granted legal permanent residency. Petitioner has resided in the United States continuously since that time. In the 1960's, petitioner was convicted of carrying a concealed weapon, a felony, though it was later reduced to a misdemeanor and thereafter dismissed.

## I

### *The 1981 Convictions*

Most of the information pertaining to the 1981 trial proceedings originates from *People v. Schuster* (May 4, 1983, 3 Crim. 11854) [nonpub. opn.]. It appears the trial court file related to the 1981 convictions, and most of documents contained therein, were destroyed at some point. Some of the information contained came from the clerk's transcript and petitioner's testimony at the evidentiary hearing on his section 1473.7 motion.

In 1981, petitioner was charged with five counts of lewd and lascivious acts against a child under 14 years old and two counts of oral copulation with a child under 14 years old and more than 10 years younger than petitioner. The victims were his daughter and stepdaughter. Petitioner's daughter testified during his trial that he fondled her, sometimes two to three times a week, with at least two events occurring when she was 13 years old. Petitioner's stepdaughter and son witnessed petitioner fondling petitioner's daughter and testified to that effect at trial.

Petitioner's stepdaughter testified that petitioner engaged in regular acts of fondling, kissing, and oral copulation with her when she was between 12 and 13 years old, sometimes multiple times a week. She also testified to another event, this time when she was 14 years old, that involved petitioner taking her clothes off prior to leading her into his bedroom, where his wife lay asleep. There, he climbed on top of his stepdaughter and repeatedly kissed and hugged her. Petitioner's wife awoke and separated the two. Petitioner's stepdaughter's testimony as to the abuse was corroborated by several witnesses.

At trial, petitioner took the stand in his own defense. He denied under oath that he sexually abused his daughter and stepdaughter, stating, "I'd cut off my arm before I'd do anything to them girls or anybody else in my family." The jury found petitioner guilty on all counts and he was sentenced to 18 years four months in prison. The trial court suspended his criminal proceedings and designated petitioner to be a mentally disordered sex offender. The court ordered him to be sent to Atascadero State Hospital for treatment in lieu of prison. Petitioner remained in the state hospital for approximately three years, whereafter he entered an outpatient treatment program. The court reinstated the criminal proceedings against him and placed petitioner on probation for 10 years. The court later agreed to terminate his probation early due to his satisfactory performance.

Petitioner appealed his convictions, which this court affirmed. (*People v. Schuster*, *supra*, 3 Crim. 11854.)

## II

### *Motion to Vacate Under Section 1473.7*

In 2022, petitioner filed a motion to vacate his sex offenses under section 1473.7. In his motion, petitioner argued the record established that, had he been informed of the potential immigration consequences of going to trial and being found guilty, there was a

reasonable probability he would have sought an immigration-neutral alternative plea bargain.

In a sworn declaration attached to his motion, petitioner described his close ties to the United States. He wrote that his wife and three children are United States citizens and all his close family live in the United States. Petitioner declared he has no connections to Austria and that deportation would be devastating for him and his family. He further declared the attorney who represented him in the sex abuse case had since passed away and that prior to trial in that case he told his attorney of his "immigration status" but "there was no discussion of any potential immigration consequences associated with the charges [he] faced prior to trial." Petitioner also declared his trial counsel did not advise him prior to trial "that if convicted[, he] faced deportation and loss of [his] residency status. Nor did [his attorney] advise [petitioner] that [he] could pursue an immigration-[neutral] plea bargain. Had [petitioner] known that [he] would be subject to adverse immigration consequences, [he] would have directed [his] attorney to negotiate an immigration-[neutral] plea bargain rather than proceed to trial."

At the evidentiary hearing on petitioner's section 1473.7 motion, petitioner testified his brother and sister helped him retain an attorney after he was arrested on suspicion of sexually abusing his daughter and stepdaughter. Petitioner described a conversation between himself and his attorney in the sex abuse case during which his former attorney inquired into his brother's accent. Petitioner responded by saying, "[W]ell, we're from Germany," although petitioner was born in Romania and previously lived in Austria. He testified the conversation regarding his brother's accent was the closest he and his attorney ever got to discussing his place of birth.

Petitioner further testified that he and his attorney never spoke about petitioner's immigration status, in direct contradiction to the statement made in his sworn declaration. When confronted with the contradiction during his testimony, petitioner explained: "Well, I filled that paper out at home and this is how it got typed up. I don't recall saying

4

that in the paper. I filled out a bunch of forms, so I could have." When pressed further on the contradiction, petitioner asked, "Would it be possible for a person to make a mistake?" Petitioner continued, "As you've noticed, I have trouble reading."

Petitioner testified his attorney never spoke to him about the potential immigration consequences of his charges. He further testified he would not have proceeded to a jury trial had he been offered a plea deal that allowed him to maintain his residency. Petitioner said, if he knew then what he knows now about the negative immigration consequences of his decision to go to trial, he "probably" would have accepted a plea of contributing to the delinquency of a minor and a sentence of three years in prison and mandatory sex offender registration if it meant avoiding deportation.

Petitioner acknowledged that, as an immigrant to the United States, he was informed prior to his initial entry that his immigration status was subject to certain rules; among them, that he had to obey the laws of the United States. He testified, however, that he only learned about the adverse immigration consequences of his felony convictions in late 2000 when he was attempting to get a new copy of his green card for the purpose of securing a social security card.

Petitioner was also questioned by the trial court. The court asked petitioner whether he was wrongfully convicted of the sex crimes committed against his daughter and stepdaughter, and whether, in fact, he was an innocent man. Petitioner responded, "[N]o. I . . . went to court hoping to prove [my] innocence, but I am not an innocent man. I am guilty of the charge."

Petitioner testified the prosecution offered him a plea deal prior to trial that involved "three years county time and probation." He said his attorney told him it "was a good deal" and that he "should probably take it." The record includes conflicting testimony regarding petitioner's recollection of the charges that were included as part of the prosecution's plea deal. When questioned by his own counsel during direct examination, petitioner testified he "[did not] know what the charges were that [he] had

to plead to." In contrast, during cross-examination, petitioner responded in the affirmative when he was asked, "[T]he plea offer that was made to you was to plead to a [section] 288, correct?" Shortly thereafter, during redirect examination, petitioner's attorney again asked whether petitioner knew what charges were included in the plea deal, to which petitioner responded, "No, there weren't any charges mentioned." Petitioner testified he declined the plea offer and took his chances at trial, stating, "I was just hoping that I would get a better deal if I went to court. Everyone in America goes to court."

Other evidence provided in support of petitioner's motion included the declaration and testimony of Christopher Todd, an attorney licensed in New York who specializes in federal immigration law. Todd declared he works as a consultant with the Sacramento County conflict defenders panel and regularly consults with defense attorneys across the state, including in Sacramento County, regarding the immigration consequences of criminal convictions. He declared, "[I]t is [his] experience that district attorney's offices are generally open to negotiating immigration neutral pleas, if the interests of justice are equally served" whereby "the criminal consequences are the same." According to Todd, petitioner's felonies make him subject to deportation by federal immigration officials because he was convicted of an aggravated felony and multiple crimes of moral turpitude.

Todd provided several "alternative plea and sentence structures that [he believed] might have been acceptable to a reasonable prosecutor" and that could have helped petitioner avoid convictions carrying negative immigration consequences: dissuading a witness, whether a felony or misdemeanor, unless he received a sentence of more than one year, in which case it could constitute an " 'obstruction of justice' aggravated felony"; misdemeanor domestic battery; simple battery; false imprisonment, whether a felony or misdemeanor; misdemeanor annoying or molesting a child; and sexual battery. He, however, explained potential complications with some of the proposed alternative charges.

6

At the evidentiary hearing, Todd testified as an expert in both immigration law and immigration consequences of California criminal convictions. He testified to the majority of the alternative charges mentioned in his declaration and others not mentioned therein, i.e., misdemeanor contributing to the delinquency of a minor, unlawful sexual intercourse with a minor, assault with a deadly weapon, and misdemeanor immoral practices in the presence of children. As to the contributing to the delinquency of a minor charge, Todd testified the crime did not exist in 1981, but if it did, it is "unlikely" to have been considered a crime of moral turpitude.

During cross-examination, Todd acknowledged he does not practice criminal law. He was also questioned about the information he was supplied with by petitioner regarding petitioner's pretrial plea offer, which he said included a sentence of three years in state prison. Todd testified he was unaware of the exact charges included in the plea offer but he "assum[ed] the [three] years would [have been based on] some sort of combination of [section] 288 and [section] 288a offenses."

Todd, in response to a hypothetical poised by the prosecutor regarding the immigration-neutral consequences of a murder charge, testified that sometimes his recommendations "may or may not be realistic" and that he has "had plenty of cases where [he has] offer[ed] alternatives and it's just not going to happen." Todd further testified his "job is to kind of give broad categories of possibilities. And sometimes it works and sometimes it doesn't."

The trial court issued a written order denying petitioner's motion. The trial court found petitioner was not a credible witness, "the record fail[ed] to establish that [petitioner] had any 'reason to believe an immigration-neutral negotiated disposition was possible,' " and "there [was] no 'objective' and 'contemporaneous' evidence suggesting he would have accepted an immigration-neutral offer." Petitioner appeals.

7

DISCUSSION

"[S]ection 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 316; § 1473.7, subds. (a)(1), (e)(1).)

Until recently, section 1473.7 applied to only convictions and sentences originating from pleas of guilty or no contest and not to those stemming from a defendant's election to proceed to trial. (Compare Stats. 2020, ch. 317, § 5 with Stats. 2021, ch. 420, § 1.) Effective January 1, 2022, Assembly Bill No. 1259 (2021-2022 Reg. Sess.) expanded the reach of section 1473.7 to include convictions and sentences imposed after an individual proceeded to trial. (*People v. Singh* (2022) 81 Cal.App.5th 147, 150; Cal. Const., art. IV, § 8, subd. (c).) Most appellate cases addressing section 1473.7 motions have been decided in the context of a petitioner opting to accept a plea rather than to proceed to trial. This is a rare instance in which petitioner purportedly rejected a plea offer and opted for a jury trial.

In the context of convictions resulting from a petitioner's decision to proceed to trial, the trial court is tasked with determining whether the petitioner can prove by a preponderance of the evidence that there was a viable immigration-neutral alternative, *and* that there was a reasonable probability the petitioner would have taken that alternative if the petitioner had been fully informed of the immigration consequences. (*People v. Singh*, *supra*, 81 Cal.App.5th at p. 154; see *People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).) The trial court must " 'look to contemporaneous evidence to substantiate a [petitioner]'s expressed preferences' " (*Singh*, at pp. 154-155) and the petitioner "must provide ' " 'objective evidence' " ' " to corroborate factual assertions" (*People v. Espinoza*, *supra*, 14 Cal.5th at p. 321). "Objective evidence includes facts

8

provided by declarations, contemporaneous documentation of the [petitioner]'s immigration concerns or interactions with counsel, and evidence of the charges the [petitioner] faced." (*Ibid.*)

When the trial court assesses whether a petitioner has shown a reasonable probability that he, she, or they would have taken an immigration-neutral alternative, the court considers the totality of the circumstances. (*Vivar*, *supra*, 11 Cal.5th at p. 529.) "Factors particularly relevant to this inquiry include the [petitioner]'s ties to the United States, the importance the [petitioner] placed on avoiding deportation, the [petitioner]'s priorities in seeking a plea bargain, and whether the [petitioner] had reason to believe an immigration-neutral negotiated disposition was possible." (*Id*. at pp. 529-530.)

We independently review a trial court's order denying a section 1473.7 motion. (*Vivar*, *supra*, 11 Cal.5th at p. 527.) " '[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' " (*Ibid*.) We must "give particular deference to factual findings based on the trial court's personal observations of witnesses" (*id*. at pp. 527-528), while giving "substantial weight to the trial court's credibility findings" (*id*. at p. 524). In contrast, when "the facts derive entirely from written declarations and other documents, . . . there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and th[e appellate] court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding. [Citation.] Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Id*. at p. 528.)

Petitioner argues: (1) "the trial court erred in finding [petitioner] failed to establish a reasonable probability [that] he would have accepted an immigration-[neutral] plea bargain based on [petitioner]'s [decision] to proceed to trial [in 1981] without an awareness of the [potential] immigration consequences"; (2) the trial court erred in

9

finding petitioner "failed to establish a reasonable probability [that] he would have accepted an immigration-[neutral] plea agreement because he failed to establish the prosecution would have accepted such [an] offer"; and (3) the trial court erred in finding petitioner "failed to produce sufficient objective contemporaneous evidence to establish a reasonable probability he would have accepted an immigration-[neutral] plea bargain." (Capitalization & boldface omitted.) He further argues we should not give deference to the trial court's finding that petitioner was not credible.

Because the independent standard of review applies in this appeal, we do not address petitioner's arguments that the trial court erred in applying the law to the facts; we simply apply the law to the facts independently. We further decline petitioner's request to disregard the trial court's determination that petitioner was not credible.

Petitioner contends the trial court's "sole bases for finding him not credible as to" the assertion that he would have accepted an immigration-neutral plea agreement consists of "a single misstatement in [his] declaration, which he credibly explained at trial, and his decision to go to trial over 40 years earlier, at a time when he was unaware of the immigration consequences of proceeding to trial." He thus argues we should review the trial court's credibility determination afresh, without deferring to the trial court. Petitioner is mistaken regarding the bases for the trial court's credibility determination.

The trial court found: "[Petitioner] testified that he would have accepted an immigration friendly plea offer even if it meant admitting molesting his victims, but the [c]ourt finds his assertion is not credible. [Petitioner] has lied under oath at least twice. At trial, he unequivocally declared his innocence. He dramatically proclaimed he would 'cut off [his] arm before [he'd] do anything to them girls or anybody else in [his] family.' [Citation.] He now admits he lied to the jurors. The admission confirms [petitioner] will prioritize his own self-interest over his oath to tell the truth. [Petitioner]'s deceit continued with the filing of his declaration. [¶] The sworn declaration states he informed his counsel of his immigration status, but in court [petitioner] testified he never told his

10

counsel he was an immigrant. [Petitioner] attempted to explain away the discrepancy by stating he filled out 'that paper' at home and 'this is how it got typed up.' He said he did not recall 'saying that in the paper.' The [c]ourt finds [petitioner]'s explanation lacks credibility. As a result of these two lies under oath, the [c]ourt gives [petitioner]'s statements regarding what he would have done had he known about the immigration consequences of a conviction little weight."

The record indicates the trial court concluded petitioner lacked credibility not based on a "single misstatement" in petitioner's declaration or based on petitioner's decision to go to trial, but rather on the fact that petitioner lied twice under oath. According to the trial court, petitioner's dishonesty indicated he "will prioritize his own self-interest over his oath to tell the truth." We accept the trial court's assessment. We further note that petitioner contradicted himself several times during the evidentiary hearing regarding the charges included in the plea agreement. He twice testified that he did not know what charges were included in the plea agreement but then responded in the affirmative when asked whether he would have been required to plead guilty to a section 288 charge.

In arguing for us to afford no deference to the trial court's credibility finding, petitioner relies on *Vivar* and *Espinoza*. Neither case aids his cause. The review in *Vivar* was on a cold record comprising of only written declarations and other documents; our Supreme Court thus reviewed the entire record independently. (*Vivar*, *supra*, 11 Cal.5th at p. 528.) In *Espinoza*, the trial court held no evidentiary hearings and instead relied on written declarations from the defendant and an immigration attorney. (*People v. Espinoza*, *supra*, 14 Cal.5th at pp. 317, 319.) Our Supreme Court again reviewed the entire record independently. (*Id.* at pp. 319-320 ["Because the trial court here conducted no evidentiary hearing, there is no basis for deference"].)

Here, unlike *Vivar* and *Espinoza*, the trial court relied on both petitioner's declaration *and* his live testimony during the evidentiary hearing to determine whether

11

petitioner was credible.  The trial court thus based its credibility finding on what it ' " 'heard and observed' " ' and not entirely on petitioner's written declaration.  (*Vivar*, *supra*, 11 Cal.5th at pp. 527-528.)  The record shows as much, and we thus give deference to the trial court's credibility finding.

After giving deference to the trial court's credibility finding and considering the absence of any other credible evidence to establish that petitioner would have accepted an immigration-neutral plea bargain, we independently conclude petitioner failed to establish that he is entitled to section 1473.7 relief.  (See *Vivar*, *supra*, 11 Cal.5th at pp. 529-530.)  Petitioner failed to show by a preponderance of the evidence that there was a reasonable probability he would have taken an immigration-neutral plea deal if one had been presented to him.  We recognize petitioner has substantial ties to the United States. But that factor alone is insufficient to make the required showing.  (See *People v. Diaz* (2022) 76 Cal.App.5th 102, 115.)

Petitioner testified he knew his immigration status was subject to certain rules, including that he had to obey the laws of the United States.  He further testified that he had a plea deal offered to him for a three-year sentence, which his attorney said "was a good deal" and that he "should probably take it," but petitioner declined that offer. Petitioner's motivation to go to trial, as stated in his testimony, was to prove his innocence, even though he knew that he was guilty of the charges against him.  In his words, he wanted "a better deal" and he believed everyone in the United States goes to trial.  Even though petitioner testified he would have "probably" accepted a plea of contributing to the delinquency of a minor and a sentence of three years in prison and mandatory sex offender registration if it meant avoiding deportation, Todd testified that the offense of contributing to the delinquency of a minor did not exist in 1981.

Petitioner did not establish that he put any priority on avoiding deportation, despite his knowledge that his immigration status was contingent on obeying the United States' laws.  He further did not show by a preponderance of the evidence that he had any

reason to believe an immigration-neutral negotiated disposition was possible in 1981. While Todd provided a list of potential alternative charges, petitioner did not establish that any of those offenses would have been acceptable in negotiations with the prosecution or when presented to the trial court, especially considering the seriousness of the charges against him and the strength of the prosecution's case.  (See *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 665 [the petitioner failed to establish "he 'had reason to believe an immigration-neutral negotiated disposition was possible' " because "[h]e did not offer an expert declaration opining that alternative, nondeportable dispositions would have been available and *acceptable* to the prosecutor" (italics added)]; *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1073-1074 [" '[I]n determining the credibility of a [petitioner]'s claim [of prejudice], the court . . . may consider,' " among other things " 'whether the [petitioner] had reason to believe that the charges would allow an immigration-neutral bargain that a court would accept' "].)

Accordingly, petitioner has failed to meet his burden under section 1473.7.

## DISPOSITION

The order denying petitioner's section 1473.7 motion is affirmed.


/s/
ROBIE, Acting P. J.


We concur:


/s/
KRAUSE, J.


/s/
BOULWARE EURIE, J.

14